[Cite as *Cleveland v. Power Home Solar, L.L.C.*, 2024-Ohio-2145.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  | JUDGES: |
|---|---|---|
| KIMBERLY CLEVELAND, ET AL | : | Hon. W. Scott Gwin, P.J |
|  | : | Hon. William B. Hoffman, J. |
| Plaintiffs-Appellees | : | Hon. Craig R. Baldwin, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. 2023CA00164 |
| POWER HOME SOLAR, LLC, ET AL | : |  |
|  | : |  |
| Defendants-Appellants | : | OPINION |

CHARACTER OF PROCEEDING:     Appeal from the Stark County Court of
                             Common Pleas, Case No 2023CV00730

JUDGMENT:                    Affirmed

DATE OF JUDGMENT ENTRY:      June 4, 2024

APPEARANCES:

For Plaintiffs-Appellees                For Defendants-Appellants

STACIE L. ROTH                          ELISABETH GENTILE
The Carnegie Building                   65 East State Street, Suite 2550
236 3rd Street S.W.                     Columbus, OH 43215
Canton, OH  44702

*Gwin, P.J.,*

{¶1} Appellant Power Home Solar, LLC appeals the November 7, 2023 judgment entry of the Stark County Court of Common Pleas denying their motion to compel arbitration.

*Facts & Procedural History*

{¶2} On April 24, 2023, appellees Kimberly and William Cleveland filed a complaint against Jayson Waller (founder and CEO of Power Home Solar), Power Home Solar, LLC d/b/a Pink Energy ("PHS"), Cross River Bank, Sunlight Financial, LLC, Trivest Partners, AM Roofing & Siding, LLC, and Aaron Maddux. PHS filed bankruptcy on October 7, 2022, but appellees received relief from the automatic stay to pursue the claims listed in their complaint.

{¶3} Appellees entered into a "Solar Energy System Purchase & Installation Agreement" ("Agreement") with PHS and a "Loan Agreement" with Cross River Bank and Sunlight Financial on May 1, 2021. On May 25, 2021, PHS installed twenty-eight solar panels on the roof over appellees' indoor pool room. In June of 2021, the panels failed an electrical inspection. After a heavy storm on June 30, 2021, there was leakage and flooding from the roof where the panels had been installed. PHS switched out the incorrect panels for new panels in July of 2021. The new panels failed to activate and the new wiring installation failed electrical inspection. Because the panels were never able to be activated, they were removed from appellees' property in 2022.

{¶4} Appellees allege as follows in their complaint: Waller developed sales techniques, and routinely pushed for sales representatives to engage in hard-sell tactics; PHS and Waller directed and trained employees to engage in pressured and hard-sell

sales tactics, including misleading customers as to the efficiency of the solar panels and manipulating "pain points" regarding customers' electric bills; and PHS and Waller directed and trained employees to misrepresent tax credits, and make false promises regarding discounts, rebates, and deductions. As to the transaction on May 1, 2021, appellees allege: the PHS employee/agent produced an electronic copy of the Agreement on a tablet; the Agreement was not provided in written, hard-copy format; the salesman acquired appellees signatures on the arbitration provision without appellees' knowledge and consent by having them sign electronically and without giving them a chance to review it; the salesman used high pressure sales tactics; the salesman scrolled through the Agreement at an unacceptably rapid pace; appellees signed the Agreement via DocuSign, which included auto-filling of their initials after each paragraph; and appellees also received the Loan Agreement in the same manner and format.

{¶5} Appellees asserted the following claims against PHS and Waller: breach of contract; fraudulent misrepresentation; negligent misrepresentation; fraud in the inducement; a declaratory judgment action to void the undisclosed arbitration agreement and limitation of liability clauses in the Agreement; a declaratory judgment action to void the undisclosed arbitration agreement and limitation of liability clauses in the Loan Agreement; negligent selection, retention, and training; breach of warranty; violations of the Ohio Consumer Sales Practices Act ("CSPA"); civil conspiracy; negligence; a declaratory judgment action to hold Waller personally liable for damages associated with PHS' fraudulent sales and marketing practices; and a punitive damages claim.

{¶6} Waller filed a motion to dismiss the complaint against him pursuant to Civil Rule 12(B)(6), in which he argued: appellees failed to state a claim against him because

the complaint consisted only of vague accusations that fall short of Ohio's pleading standards; appellees did not allege specific facts from which Waller could be held individually liable for the alleged acts of PHS; appellees failed to adequately plead their fraud-based claims; appellees failed to adequately plead negligent retention, hiring, and training claims; and the economic loss doctrines precludes appellees from recovering purely economic losses.

{¶7} Appellees filed a memorandum in opposition to the motion to dismiss on June 26, 2023. After requesting a fourteen-day extension, Waller filed his reply brief on July 17, 2023. The trial court denied Waller's motion on July 31, 2023. Waller filed a motion for reconsideration on September 7, 2023, arguing that personal officer liability against Waller cannot lie due to the alleged corporate conduct of PHS. The trial court denied Waller's motion to reconsider on September 22, 2023.

{¶8} Sunlight Financial filed a motion to compel arbitration on May 31, 2023. Cross River Bank sought to join in Sunlight Financial's arbitration motion on June 13, 2023. Appellees filed memoranda in opposition to the motions. Sunlight Financial filed a reply brief in support of their motion to compel arbitration on July 18, 2023.

{¶9} On July 31, 2023, the trial court issued a judgment denying Sunlight Financial's motion to compel arbitration. The trial court found the arbitration provision substantively and procedurally unconscionable. Sunlight Financial appealed the trial court's order.

{¶10} PHS filed an answer to appellees' complaint on July 10, 2023. PHS did not assert arbitration as an affirmative defense. Waller filed an answer to the complaint on August 10, 2023. Waller did assert arbitration as an affirmative defense, stating "plaintiffs

failed to abide by the terms and conditions of their contract with the Defendant Power Home Solar which requires the plaintiffs' to arbitrate any dispute arising from its contract with Power Home Solar."

{¶11} The parties filed a Report of Discovery Planning Meeting and Agreed Discovery Plan on September 19, 2023. The report stated the discovery and planning meeting occurred on September 8, 2023 and counsel for Waller and PHS participated. Waller and PHS sought to stay discovery in the case pending Sunlight Financial's appeal, but, alternatively, were willing to agree to deadlines at the initial pre-trial. The trial court held a pre-trial and case management conference on September 26, 2023, setting case management dates.

{¶12} PHS filed a motion to compel arbitration on October 11, 2023. Waller filed a motion to compel arbitration on October 25, 2023.

{¶13} Appellees filed a memorandum in opposition to PHS and Waller's motions to compel arbitration, arguing the parties waived their right to arbitrate and arguing the arbitration provision is substantively and procedurally unconscionable. Appellees attached to their memorandum the American Arbitration Association's Construction Industry Arbitration Rules and Mediation Procedures, and the American Arbitration Association's Consumer Arbitration Rules.

{¶14} Appellees also attached to the memorandum in opposition the affidavit of Kimberly Cleveland. She averred as follows: PHS' advertisements represented the superior quality and craftsmanship of its solar energy systems and components, the superior skill and expertise of its installers, the continual maintenance of the solar energy systems after they were installed, the extraordinary savings the solar energy systems

would generate, and the near-complete reduction in monthly electric bills; on May 1, 2021, a salesperson identifying themselves as an agent for PHS represented the cost of the solar energy system would be $122,478, the system would produce approximately 9,365 watts per year, she would be eligible for various credits and other discounts including a federal tax credit if she would immediately sign the agreements to finance and install the solar energy system; the salesperson stated the discounts and credits could not be promised if she did not immediately sign the agreements; the cost of the system included the cost of a new roof for the house that she was advised was needed to safely install the system; as a result of these representations, she felt rushed to enter into the Agreement and Loan Agreement; after explaining the agreements needed to be signed as a condition to receiving the solar energy system and aforementioned credits and discounts, the salesperson presented the Sales Agreement that he requested she sign; the salesman asked her to first sign the electronic block with her full signature and initials; her signature and initials were auto-filled throughout the document, so she never signed or initialed any other portion of the Agreement; the salesperson gave a rapid and inaccurate summary of the contents of the Agreement; the portions of the Agreement discussing arbitration and limitation of liability were not fully or accurately explained; she was not told she was giving up the right to pursue an action in a court of law, that she was giving up a right to a jury trial, or that the provision was limiting the amount of compensation she could be awarded; she was not given the opportunity to seek other sources of financing because she was told time was of the essence to qualify for the credits and promotions described above; the salesperson rapidly and inaccurately summarized the contents of the Loan Agreement; her signature and initials on the Loan Agreement were only entered once and

then auto-filled throughout the rest of the Loan Agreement, including the initials that appear near the portion of the agreement discussing arbitration; at no time during the signing was she provided with a hard copy of either the Agreement or Loan Agreement; she had to rely solely on the inaccurate interpretation and explanation of the agreements by the salesperson; she was not told any portion of the agreements were negotiable; she was concerned that if she questioned any provision of the Loan Agreement or Agreement, she would not be able to purchase the solar panels and take advantage of the discounts and credits promised; and she did not receive all the rebates, deductions, and credits she was promised.

{¶15} The trial court issued a detailed and thorough judgment entry on November 7, 2023. The trial court denied the motion to compel arbitration for two separate reasons: (1) waiver and (2) unconscionability. As to waiver, the trial court found PHS knew of the existence of the arbitration provision, failed to assert any right to arbitration in their answer, acted inconsistently with its rights, actively participated in the litigation without demanding arbitration, and appellees were prejudiced by this delay in demanding arbitration.

{¶16} With regard to procedural unconscionability, the trial court examined the Agreement and the circumstances surrounding the execution of the Agreement, and noted the following: appellees had no role in preparing the document; the document is a pre-printed form contract that was wholly electronic and viewable only on an electronic tablet that belonged to the PHS employee; the document is forty pages long and includes multiple "sub-agreements"; appellees were never given an opportunity to review the document at their own pace; appellees did not receive a hard copy of the agreement; the

salesman swiped through each page and summarized the forty-page document in less than two minutes; appellees were not told any of the provisions were negotiable; Kimberly only signed her name once and never signed or initialed any other portion of the document; the signatures and initials of appellees were auto-filled through the document, including the signatures at the end of the arbitration section; Kimberly was told time was of the essence to obtain certain tax credits, promotions, or discounts; the sales representative scrolled through the document in a rapid fashion, providing verbal (and allegedly inaccurate) summaries, but never disclosed the arbitration agreement; appellees had no ability to change any of the contract terms; the electronic signature appearing twenty-five times throughout the document was the same and was signed in a rapid fashion; because each section was not specifically read and initialed, it is impossible to discern whether appellees read or had an opportunity to read any of the sections; and the sales agent who presented the Agreement had superior experience with respect to this contract and type of sales mechanism in comparison to appellees.

{¶17} The trial court also found the arbitration agreement substantively unconscionable for these reasons: the consumer and construction arbitration rules were never provided to appellees; the arbitration clause does not say what the costs of arbitration will be, prohibits appellees from joining in a class action suit, and states arbitration proceeding must be confidential; PHS is permitted to take self-help actions outside of arbitration such as removal of the entire system and filing of a mechanic's lien or UCC financing statement in the event of a default by appellees; arbitration would be costly as opposed to the cost of a jury trial; and, even though the bulk of the claims are not about construction itself, but about the circumstances surrounding the inducement

and execution of the contract which involve allegations of fraud, collusion, and CSPA violations, appellees had to agree to Construction Industry Arbitration in the arbitration agreement. The trial court also examined, in detail, how the Construction Industry Arbitration Rules limited the rights of appellees as opposed to a traditional case in the common pleas court with a jury trial.

{¶18} Appellant PHS appeals the November 7, 2023 judgment entry of the Stark County Court of Common Pleas and assigns the following as error:

{¶19} "I. THE TRIAL COURT ERRED IN DENYING POWER HOME SOLAR, LLC D/B/A PINK ENERGY'S MOTION TO COMPEL ARBITRATION BASED ON THE COURT'S FINDING THAT PINK ENERGY WAIVED ITS RIGHT TO ARBITRATION.

{¶20} "II. THE TRIAL COURT ERRED IN DENYING PINK ENERGY'S MOTION TO COMPEL ARBITRATION BASED ON THE COURT'S FINDINGS THAT THE ARBITRATION PROVISION IN THE SALES AGREEMENT BETWEEN APPELLEES AND PINK ENERGY IS UNENFORCEABLE."

{¶21} In denying appellant's motion to compel arbitration, the trial court made two separate determinations, either of which would result in a denial of the motion to compel: (1) waiver and (2) unconscionability.

I.

{¶22} In their first assignment of error, PHS contends the trial court committed error in finding PHS waived its right to arbitrate.

{¶23} Where the issue is whether a party has waived arbitration, we apply an abuse of discretion standard due to the "fact-driven" nature of the inquiry. *Steese v. Canton Regency*, 5th Dist. Stark No. 2022CA00038, 2022-Ohio-4711. An abuse of

discretion means the trial court's decision is arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983). "Waiver attaches where there is active participation in a lawsuit evincing an acquiescence to proceeding in a judicial forum." *Tinker v. Oldaker*, 10th Dist. Franklin Nos. 03AP-671, 03AP-1036, 2004-Ohio-3316.

{¶24} As with any other contract, a party may waive the right to arbitrate. *Crosscut Capital, LLC v. Dewitt*, 10th Dist. Franklin No. 20AP-222, 2021-Ohio-1827. In light of Ohio's public policy favoring arbitration, the party asserting waiver bears the burden of proof. *Id.* A party asserting waiver must establish: (1) the waiving party knew of the right to arbitrate; and (2) under the totality of the circumstances, the waiving party acted inconsistently with that known right. *Id.* No one factor is determinative of whether the party seeking arbitration has acted inconsistently with the right to arbitrate. *Id.*

{¶25} "The essential question is whether, based on the totality of the circumstances, the party seeking arbitration has acted inconsistently with the right to arbitrate." *Harsco Corp. v. Crane Carrier Co.*, 122 Ohio App.3d 406, 701 N.E.2d 1040 (3rd Dist. Union 1997). In determining whether the totality of the circumstances supports a finding of waiver, the court may consider such factors as: (1) any delay in the requesting party's demand to arbitration via a motion to stay judicial proceedings and an order compelling arbitration; (2) the extent of the requesting party's participation in the litigation prior to its filing a motion to stay the judicial proceeding; (3) whether the requesting party invoked the jurisdiction of the court by filing a counterclaim or third-party complaint without asking for a stay of the proceedings; and (4) whether the non-requesting party has been

prejudiced by the inconsistent acts of the requesting party. *Church v. Fleishour Homes, Inc.*, 172 Ohio App.3d 205, 2007-Ohio-1806, 874 N.E.2d 795 (5th Dist. Stark).

{¶26} In this case, it is clear PHS knew of the right to arbitrate. The PHS logo appears at the top of each page of the agreement, including the pages containing or referencing the arbitration agreement. The complaint alleged numerous claims, including declaratory judgment claims to void the undisclosed arbitration agreements and limitation of liability clauses in the Agreement and Loan Agreement. The Agreement and Loan Agreement were attached to the complaint. PHS was served with the complaint on April 28, 2023. Accordingly, PHS' right to arbitrate was triggered in April of 2023.

{¶27} Further, we find PHS acted inconsistently with the right to arbitrate. PHS filed its answer without first requesting a stay, thereby indicating the invocation of the trial court's jurisdiction. Additionally, PHS did not include the right to arbitration as an affirmative defense, or otherwise, in its answer. "Although it is not necessary to affirmatively plead arbitration as a defense in order to avoid waiver, the failure to plead such right may be considered as a factor under the totality of the circumstances." *Crosscut Capital, LLC v. Dewitt*, 10th Dist. Franklin No. 20AP-222, 2021-Ohio-1827. The failure to include the right to arbitrate in their answer supports a finding of waiver, particularly in this case because, by the time PHS filed its answer, Sunlight Financial had already filed a motion to compel arbitration.

{¶28} PHS also waited over five-and-a-half months from the filing of the complaint before filing the motion to compel arbitration. While PHS cites several cases in which delays of three to six months did not establish waiver of a party's right to arbitrate, this Court has specifically stated, "while we recognize a number of courts have found this

general time period of three to six months insufficient to show waiver, we note other courts have found this general time period to be sufficient, depending upon the degree of participation in the litigation during this time period." *Steese v. Canton Regency*, 5th Dist. Stark No. 2022CA00038, 2022-Ohio-4711; see also *Debois v. Guy*, 8th Dist. Cuyahoga No. 108943, 2020-Ohio-4989 (a delay of six months has been deemed sufficient to show waiver, depending upon the degree of participation in the litigation).

**{¶29}** We find the trial court did not abuse its discretion in determining PHS extensively participation in the litigation during this time. PHS participated in the litigation not only by filing an answer prior to demanding arbitration, but by participating in the parties' Rule 26(F) planning meeting, signing off on a report filed on September 19, 2023. PHS also participated in a lengthy pre-trial/case management conference with the trial court on September 26, 2023, during which the parties, including PHS, agreed to a comprehensive case management schedule and private mediation. Much of this occurred after the trial court issued a judgment entry on July 31, 2023 stating, "of additional concern is the fact that Defendants Power Home Solar/Pink Energy, despite having a similar agreement with Plaintiffs, have not demanded arbitration * * *." Despite this explicit language in July of 2023, PHS participated in the litigation for another two-and-a-half months before it filed its motion to compel arbitration. PHS' participation was not passive, and this factor weighs in favor of finding PHS acted inconsistently with the right to arbitrate. *Steese v. Canton Regency*, 5th Dist. Stark No. 2022CA00038, 2022-Ohio-4711.

**{¶30}** As to the fourth factor, we find the trial court did not abuse its discretion in finding appellees were prejudiced by the inconsistent acts of PHS due to the extensive

motion practice and case management details that had already been completed in the case by the time PHS filed its motion to compel arbitration.

{¶31} Having reviewed the totality of the circumstances, considering Ohio's public policy favoring arbitration and mindful of the standard of review, we find the trial court did not abuse its discretion in concluding PHS waived its right to arbitration. PHS' first assignment of error is overruled.

II.

{¶32} In their second assignment of error, PHS contends the trial court committed error in denying their motion to compel arbitration due to substantive and procedural unconscionability. Arbitration agreements are valid, irrevocable, and enforceable, except upon grounds that exist in law or equity for the revocation of any contract. *Taylor Building Corp. of Am. v. Benfield*, 117 Ohio St.3d 352, 2008-Ohio-938, 884 N.E.2d 12. Unconscionability is a ground for revocation of a contract. *Id.*

{¶33} This Court uses a de novo standard of review to determine whether an arbitration agreement alleged to be unconscionable is enforceable. *Id.* However, "when a trial court makes factual findings supporting its determination that a contract is or is not unconscionable, such as any findings regarding the circumstances surrounding the making of the contract, those factual findings should be reviewed with great deference." *Id.*

{¶34} Unconscionability refers to the absence of a meaningful choice on the part of one of the parties to a contract, combined with contract terms that are unreasonably favorable to one party. *Id.* Accordingly, unconscionability consists of two separate concepts: (1) substantive unconscionability, which refers to the commercial

reasonableness of the contract terms themselves and (2) procedural unconscionability, which refers to the bargaining positions of the parties. *Id.* In order to negate an arbitration clause, a party asserting unconscionability must establish a quantum of both substantive and procedural unconscionability. *Id.*

*Procedural Unconscionability*

**{¶35}** Procedural unconscionability involves factors bearing on the relative bargaining positions of the contracting parties, such as age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, whether alteration in the printed terms were possible, and whether there were alternative sources of supply for the goods in question. *Taylor Building Corp. of Am. v. Benfield*, 117 Ohio St.3d 352, 2008-Ohio-938, 884 N.E.2d 12.

**{¶36}** In this case, it is undisputed that appellees had no role in preparing the Agreement or the arbitration clause. The Agreement is a preprinted form contract which was wholly electronic and viewable only on the electronic tablet of the PHS representative during the course of the sale. The complete document is forty pages long and includes multiple "sub-agreements," such as a Roof Installation Agreement, an Addendum, and the Solar Power System Installation Agreement, plus numerous exhibits, notices, and memoranda. The sub-agreement entitled "Solar Energy System Purchase & Installation Agreement" begins on the tenth page, and is seventeen pages long, including the attached exhibits. Exhibit F to this sub-agreement contains the arbitration provision. It is written in upper-case letters and appears in single-spaced, bold type.

{¶37} We find the averments contained in Kimberly's affidavit support the trial court's finding of procedural unconscionability.   In her affidavit, Kimberly describes a scenario in which:  the contract was presented entirely electronically wherein the agent of PHS scrolled through the 40-page document rapidly; PHS' agent directed her to provide her electronic signature and initials only once; the remainder of the signatures and initials were "auto-filled" throughout the document, including the signatures lines at the end of the arbitration section; the contract terms were non-negotiable because it was pre-printed on the electronic tablet controlled by PHS' agent; she had no option to reject or negotiate the arbitration provision; she was hurried and rushed through the signature process, because she was told certain credits, promotions, and discounts may not be available if the documents were not signed immediately; she was not able to review the documents at her own pace; important terms were either not explained or not explained accurately because the agent summarized the 40-page document in less than two minutes; and she did not receive a hard copy of the contract or arbitration agreement to review.  PHS did not submit any evidence or affidavits to contradict Kimberly's assertions regarding the circumstances surrounding the execution of the agreement.

{¶38} The timing of the signatures on the documents also demonstrates procedural unconscionability.   The first page of the Agreement, "Offsets to 100% or Greater," purports to bear the electronic signature of appellees.  The next page is entitled "Addendum," which purports to contain the exact same electronic signature of Kimberly, timed at 2:45 p.m. EDT, as well as the typed name of William, timed at 11:47 PDT (presumably an electronic mistake which should have been 2:47 EDT).  Several pages later, a DocuSign "Certificate of Completion" tracks the progress of signing the

documents.  It indicates the document contains 32 pages, with 25 signatures and 17 initials.  The document originated with the PHS agent at 1:33:20 p.m. on May 1, 2021.  It was "sent" to the agent at 1:34:07 p.m. and "signed" by the agent at 2:44:09 p.m.  The documents were "sent" to Kimberly at 2:44:12 p.m., "viewed" by her at 2:44:43 p.m., and "signed" by her at 2:45:52 p.m.  William was "sent" the documents at 2:18:10 p.m., "viewed" them at 2:20:05 p.m., and "signed" them at 2:20:54 p.m.

{¶39}  The next section of the contract begins on the eighth page of "Exhibit A," a two-page section called "Roofing Installation Agreement."  This is followed by a "Solar Energy System Purchase & Installation Agreement."  This section contains numerous initialed spaces being the identical, auto-populated initials of appellees, although it is unclear where the first or original initialing actually occurred.  The "Terms and Conditions" of the Solar Energy Purchase Agreement begin on the seventh page of that portion of the Agreement.  The terms and conditions are five pages long, singled-spaced, in ten-point font.  There is an electronic signature at the end of the terms and conditions segment.  This signature page is 19 pages beyond the Addendum appearing at the beginning of the document.  However, it contains the identical electronic signatures that appear on the Addendum, with precisely the same timing (2:45 p.m. EDT for Kimberly and 11:47 a.m. PDT for William).  Five pages later is "Exhibit F," the arbitration agreement.  It also contains the same electronic signatures with exactly the same time markings.

{¶40}  We agree with the trial court that because each section was not specifically read and individually initialed by appellees, we cannot discern whether appellees read, or had an opportunity to read, any of the sections.  Even though the arbitration provision is in bold print, the signatures on the document acknowledging they read, reviewed, and

agreed to the arbitration provision were not specifically made by appellees. Rather, they were "auto-filled" onto the provision. This provision was prepared by PHS, not appellees. Appellees did not have an opportunity to make any changes to any portion of the arbitration agreement.

**{¶41}** Due his position, the sales agent who scrolled through the Agreement had superior experience with respect to the contract and this type of sale mechanism, in comparison to appellees. Despite his superior position, the agent never informed appellees about the arbitration agreement, and failed to inform them that when the documents were "auto-filled," such auto-filling would result in a forfeiture of their right to a court adjudication or jury trial.

**{¶42}** We find the trial court did not commit error in finding the Agreement and arbitration provision procedurally unconscionable.

*Substantive Unconscionability*

**{¶43}** Substantive unconscionability involves factors which relate to the contract terms themselves and whether they are commercially reasonable. *Id.* Because this varies by contract, no generally accepted or bright-line set of factors has been developed for this category of unconscionability. *Fortune v. Castle Nursing Home, Inc.*, 164 Ohio App.3d 689, 2005-Ohio-6195, 843 N.E.2d 1216 (5th Dist. Holmes). However, courts examining whether a particular limitations clause is substantively unconscionable have considered some of the following factors: fairness of the terms, charge for the service rendered, standard in the industry, and ability to accurately predict the extent of future liability. *Id.*

{¶44} In their complaint, appellees allege claims for fraud, declaratory judgment, civil conspiracy, and violations of the CSPA. In cases involving the CSPA, an arbitration provision may be substantively unconscionable if it involves fee-shifting or excessive costs, when it prohibits class actions, when it restricts discovery, or when it requires confidentiality. See e.g., *Eagle v. Fred Martin Motor Co.*, 157 Ohio App.3d 150, 2004-Ohio-829, 809 N.E.2d 1161 (9th Dist. Summit 2004). In this case, the arbitration agreement prohibits appellees from joining in any class action and states the proceedings "shall" be confidential.

{¶45} Unlike the arbitration provision in the Loan Agreement, the arbitration provision in the Agreement requires appellees to proceed with arbitration under Construction Industry Rules, rather than Consumer Arbitration Rules. Appellees attached AAA's published Construction Industry Rules and Consumer Arbitration Rules to their brief opposing PHS' motion to stay. Those rules reveal that the fees required to pursue the claims vary with the amount of damages alleged. Further, these fees do not reflect additional costs that will be incurred by the parties during the course of arbitration. See *Porpora v. Gatliff Bldg. Co.*, 160 Ohio App.3d 843, 2005-Ohio-2410, 828 N.E.2d 1081 (9th Dist. Medina). This process seems particularly unreasonable in light of the much greater bargaining power of PHS. See *Williams v. Aetna Finance Co.*, 82 Ohio St.3d 464, 700 N.E.2d 859 (1998).

{¶46} The arbitration clause does not disclose either the costs of arbitration or the fact that those costs are substantially higher than the costs associated with a regular court proceeding. *Porpora v. Gatliff Bldg. Co.*, 160 Ohio App.3d 843, 2005-Ohio-2410, 828 N.E.2d 1081 (9th Dist. Medina). While the clause makes clear that the AAA's

Construction Industry Rules govern, the clause makes no reference to the fees required by that group. *Id.* Prohibitive arbitration costs and fees alone may render an arbitration provision substantively unconscionable upon a case-by-case determination. *Nefores v. Branddirect Marketing, Inc.*, 5th Dist. Richland No. 03-CA-104, 2004-Ohio-5006; *Brunke v. Ohio State Home Services, Inc.*, 9th Dist. Lorain No. 08CA009320, 2008-Ohio-5394. In this case, the arbitration provision fails to set forth any of the arbitration fees or costs. This is worsened by the fact that the PHS salesman failed to give appellees any meaningful explanation of the arbitration provision. *Brunke v. Ohio State Home Services, Inc.*, 9th Dist. Lorain No. 08CA009320, 2008-Ohio-5394. Also weighing in favor of a finding of unconscionability is that the fees in Construction Industry Arbitration are shared equally between the parties, whereas, in Consumer Arbitration, the supplier/seller must bear a larger share of the costs than the consumer.

{¶47} Further, the arbitration clause is skewed in favor of PHS, imposing restrictions on appellees alone. PHS is permitted to pursue other methods in the event of the default of appellees, such as the filing of a mechanic's lien and/or a UCC-1 financing statement. However, the arbitration clause provides appellees have only one method through which to enforce the contract, i.e., arbitration. *Porpora v. Gatliff Bldg. Co.*, 160 Ohio App.3d 843, 2005-Ohio-2410, 828 N.E.2d 1081 (9th Dist. Medina).

{¶48} We find there are concerns regarding the form of the document in which appellees allegedly waived their right to a jury trial, specifically the number of sub-agreements, and the fact that the documents contained no warnings that by signing the Agreement, appellees were waiving their right to a jury trial. The format of the document

and language used is such that a person executing the document is not placed on notice of the ramifications of agreeing to such a clause.

{¶49} In this case, the arbitration provision fails to clearly and unequivocally alert appellees that, by executing the Agreement and included arbitration clause, they waive their constitutional right to a jury and waive their right to have the matter determined by a court. *Fortune v. Castle Nursing Homes, Inc.*, 164 Ohio App.3d 689, 2005-Ohio-6195, 843 N.E.2d 1216 (5th Dist. Homes); *Bayes v. Merle's Metro Builders/Boulevard Contr., LLC*, 11th Dist. Lake No. 2007-L-067, 2007-Ohio-7125. The language in the arbitration agreement states, "[t]he award rendered by the arbitrator shall be final and binding on the parties and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction." As noted by the Eleventh District, "most consumers would not equate this language with waiver of a constitutional right and waiver of right to have a dispute determined by a court * * * to the contrary, it suggests to some extent that a court will at least have some jurisdictional review of the case." *Bayes v. Merle's Metro Builders/Blvd. Constr., LLC*, 11th Dist. Lake No. 2007-L-067, 2007-Ohio-7125.

{¶50} We agree with the trial court that it is unconscionable and inappropriate for Construction Industry Arbitration Rules to be applied in a case in which the bulk of the claims are not about the construction itself, but about the circumstances surrounding the inducement and execution of the contract, and primarily involve allegations of fraud, collusion, and violations of the CSPA.

{¶51} The trial court examined the rules in the Construction Industry Arbitration proceedings and noted how these rules provide a much more restrictive proceeding than a jury trial. For example, according to the Construction Industry Rules, discovery is

extremely limited. A party may request documents and other information, but the arbitrator has the discretion to decide if this discovery will occur (Rule 24). The parties must exchange copies of the exhibits they intend to submit during the hearing seven days prior to the hearing, but the Rule provides "there shall be no other discovery," unless ordered by the arbitrator in "exceptional" cases. Further, the scope of the award that may be issued by the arbitrator is limited. An arbitrator may grant "any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties * * *." (Rule 45). This clause could arguably preclude appellees from recovering any non-contract damages on their claims for fraud, civil conspiracy, violations of the CSPA, CSPA statutory damages, or punitive damages.

{¶52} Based on the foregoing, we find the trial court did not commit error in finding substantive unconscionability.

*Adhesion Contract*

{¶53} Additionally, we find there are strong indications the Agreement is an adhesion contract. An "adhesion contract is a standardized form contract prepared by one party, and offered to the weaker party, usually a consumer, who has no realistic choice as to the contract term." *Taylor Building Corp. of Am. v. Benfield*, 117 Ohio St.3d 352, 2008-Ohio-938, 884 N.E.2d 12. One common feature of an adhesion contract is the stronger party's refusal to negotiate a key term. *Id.*

{¶54} Though an adhesion contract is not unconscionable per se, the Ohio Supreme Court has stated that an arbitration clause, "contained in a consumer credit agreement with some aspects of an adhesion contract, engenders more reservations than an arbitration clause in a different setting, such as in a collective bargaining agreement,

or a commercial contract." *Williams v. Aetna Finance Co.*, 82 Ohio St.3d 464, 700 N.E.2d 859 (1998). Further, the Supreme Court noted the presumption in favor of arbitration "should be substantially weaker" in cases in which there are "strong indications that the contract at issue is an adhesion contract, and the arbitration clause itself appears to be adhesive in nature." *Id.* The Court rationalized that, in this type of situation, there is "considerable doubt" there was a "true agreement" to submit disputes to arbitration. *Id.*

**{¶55}** In this case, there are "strong indications" the contract is an adhesion contract. Further, the arbitration clause itself appears to be adhesive in nature. The contract was a standardized form contract prepared by PHS and offered to a weaker party (appellees) as consumers, who had no realistic choice as to the terms of the contract or arbitration provision. Section 13 of the Agreement, entitled "Arbitration of Disputes" states the arbitration agreement, "shall be signed by the parties as of the date hereof." Exhibit F, the arbitration agreement, provides the parties "shall be subject to binding bilateral arbitration." Thus, the standardized contract form offered appellees goods on essentially a "take it or leave it" basis, without affording them a realistic opportunity to bargain and under such conditions that appellees could not obtain the solar panels except by acquiescing to the form contract and arbitration provision. See *Eagle v. Fred Martin Motor Co.*, 157 Ohio App.3d 150, 2004-Ohio-829, 809 N.E.2d 1161 (9th Dist. Summit 2004).

**{¶56}** Based on the foregoing, we find the trial court did not commit error in finding both procedural and substantive unconscionability. PHS' second assignment of error is overruled.

**{¶57}** PHS' first and second assignments of error are overruled.

{¶58} The November 7, 2023 judgment entry of the Stark County Court of Common Pleas is affirmed.

By Gwin, P.J.,

Hoffman, J., and

Baldwin, J., concur